**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| ROBIN BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VGW U.S., INC., VGW HOLDINGS U.S., INC., VGW MALTA LTD., and VGW LUCKYLAND, INC.<br><br>Defendants. | CASE No. ______________<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Robin Baker, individually and on behalf of the other members of the below-defined Georgia class (the "Class"), hereby alleges against Defendants VGW U.S., Inc., VGW Holdings U.S., Inc., VGW Malta Ltd., and VGW Luckyland, Inc. (together "Defendants"), upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I. INTRODUCTION

1. Defendants, collectively, are an Australian-based criminal organization that runs two illegal and unlicensed gambling websites available at ChumbaCasino.com and Luckylandslots.com.

2. Regulators in Connecticut, Idaho, Maryland, Michigan, and other states have shut down VGW's websites for providing "illegal gambling services," and threatening "criminal penalties" if VGW failed to comply. *See* Exhibits 1-3 (state agency cease-and-desist letters and

press release).[1] Even the Delaware state government—where several of the VGW Defendants were incorporated until recently—ordered VGW to "terminate any and all illegal operations" in that state. *See* Exhibit 4. Just six months ago, New York became the latest state in a growing list of states to take action against Defendants because their websites are "illegal, dangerous, and can seriously ruin people's finances." Exhibit 5.

3. Defendants' illegal websites continue to remain available here in Georgia, while falsely representing to Georgians that the activities on the websites are a "legal" form of gambling.

4. This lawsuit seeks to shut down operation of the websites in this state, and return all funds taken from Georgians who used the website.

## II. PARTIES

**Plaintiff**

5. Plaintiff Robin Baker is domiciled in Georgia. She has purchased Sweeps Coins on ChumbaCasino.com and Luckylandslots.com and lost money gambling on those websites within the applicable statute of limitations.

6. Plaintiff did not know that Luckylandslots.com and ChumbaCasino.com operated as an illegal gambling operation under Georgia law.

7. Defendants' representations and omissions led Plaintiff to believe that participation on the websites was lawful in this state.

8. Had Plaintiff known the truth, she would not have participated and would not have lost money.

9. Plaintiff's losses occurred on multiple occasions within the applicable statute of limitations, while she was physically located in Georgia.

---

[1] Exhibits referenced in this brief are attached to the supporting Declaration of Joel D. Smith.

**Defendants**

10. **Defendant VGW Holdings US Inc.** ("VGW Holdings US") is a Delaware corporation with its principal place of business at 1881 9th Street, Suite 2002, Boulder Colorado, 80302. During the relevant time period, the principal place of business and headquarters of VGW Holdings US has also been at 442 Post Street, Suite 900, San Francisco, CA 94102 (the same location as the principal place of business for VGW US Inc. and VGW Luckyland Inc.). VGW Holdings US owns and operates a series of wholly owned subsidiaries, including VGW US, Inc. and VGW Luckyland, Inc. (which owns LuckyLand Slots). VGW Holdings US controls the illegal gambling operations of these wholly owned subsidiaries under the ultimate direction of VGW Holdings Limited.

11. **Defendant VGW US Inc**. ("VGW US") is a Delaware corporation with its principal place of business at 1881 9th Street, Suite 2002, Boulder Colorado, 80302. During the relevant time period, the principal place of business and headquarters of VGW US has also been at 442 Post Street, Suite 900, San Francisco, CA 94102 (the same location as the principal place of business for VGW Holdings US Inc. and VGW Luckyland Inc.). VGW US has admitted in court filings that it "provides treasury and payment services" necessary to run the websites, and is therefore involved in their operation.

12. Both Defendants VGW Holdings US and VGW US have stated in court filings that they "specialize[] in the development and publication of online casino-themed social games," including the gambling websites at issue here.

13. **Defendant VGW Luckyland Inc.** ("VGW Luckyland") is a Delaware corporation with its principal place of business in Delaware. During the relevant time period, the principal place of business and headquarters of VGW Luckyland has also been at 442 Post Street, Suite 900, San Francisco, CA 94102 (the same location as the principal place of business for VGW Holdings US, Inc. and VGW US, Inc.). VGW Luckyland develops, markets, owns and operates the Luckyland Slots online casino gambling games, which it makes accessible to users online at the website Luckylandslots.com. During the relevant time period, VGW Luckyland has owned and operated the website Luckylandslots.com. VGW Luckyland itself, or one of the agents it appoints, also processes the gambling wagers and payments made or won by participants, including Plaintiffs and other Class members, on the Luckyland Slots platform

14. **Defendant VGW Malta Ltd.** is a Maltese corporation with its principal place of business at Trident Park, Notabile Gardens No. 6, Level 3 Central Business District Mdina Road, Zone 2 BIRKIRKARA, CBD2010, Malta. VGW Malta owns and operates the website ChumbaCasino.com. All gambling payments are processed by VGW Malta.

15. Through the websites, each Defendants conduct business in Georgia.

## III. JURISDICTION AND VENUE

16. Defendants VGW Luckyland and VGW Malta Ltd. are registered to do business in the State of Georgia and therefore consent to personal jurisdiction.

17. At all relevant times, Defendants VGW Luckyland and VGW Malta Ltd. "conduct business with and for all the" defendants, subjecting the other "affiliated parties" to personal jurisdiction. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1273 (11th Cir. 2002).

18. Defendants operate at least two highly interactive websites within the State of Georgia.

19. These websites run continuously and are designed to generate substantial revenue for Defendants year over year.

20. Unlike passive websites, Defendants' websites require users to create accounts, allow users to engage in traditional casino-style games (including live dealer games such as poker and roulette), and invite users to contact Defendants directly through the websites.

21. Through this process, Defendants seek to form contracts with Georgia residents, including Plaintiff.

22. Defendants actively advertise and solicit Georgia residents to create accounts and participate in online casino gaming on the websites.

23. Defendants use geo-targeted digital advertisements, banner ads, search-engine optimization efforts aimed at increasing visibility on search engine results pages, and direct email outreach.

24. Additionally, as shown in the images below, the websites enable continuous commercial interactions between Georgia residents and Defendants. Defendants not only track users' IP addresses, demonstrating their awareness of Georgia residents accessing and utilizing their platforms, but also collect device identifiers and activity data from users' phones. This information is used to deliver targeted advertisements, personalize content, and share advertising IDs with third-party advertisers.[2]

| | |
|---|---|
| **To provide Behavioral Advertising and Marketing** | We may use information collected through cookies and similar technologies to show you ads that are more relevant to your interests, based on your activity on our Website. This may include advertising our own services or those of other apps and websites within the VGW Group. If you wish to opt-out of Behavioral Advertising, click here. |

[2]https://media.www.chumbacasino.com/vgwholdings89e8-vgw-prod-817c/media/Project/VGW/ChumbaCasino/documents/251230_POL_CHU_Privacy_Policy_7-3.pdf (last visited Jan. 27, 2026); https://media.luckylandcasino.com/vgwholdings89e8-vgw-prod-

**Mobile device identifiers.** When you download or access our products via a mobile device, we and our service providers may receive information about your geolocation (based on your IP address) and your mobile device including device identifiers, advertising identifiers, hardware type, your operating system and your in-game activity. We may share the advertising identifier associated with your mobile device or tablet (such as the Apple IDFA and Google Advertising ID) with advertisers. VGW, our service providers and data processors may use this information to provide you with tailored advertising and other content. When you download or access our games through your mobile device, we may ask permission to track your activity. If you initially consent to tracking, you may later disable that permission in your device settings or withdraw your consent.

**Precise Geolocation Information**, including general location information and, with your explicit consent, precise geolocation information through our third party providers to verify your location, meet legal requirements and help prevent fraud. Precise geolocation data may be collected using GPS coordinates, Wi-Fi networks, IP addresses, and mobile or other device signals when interacting with our Website, and only where permitted by applicable law.

25. These activities and advertisements serve one purpose: to reach into Georgia and encourage Georgia residents to register accounts and engage in online gambling activities.

26. Once Georgia residents complete the registration process, Defendants contact

| | |
|---|---|
| **To personalize user experience** | We may use information which has been aggregated to understand how our users as a group use the services and resources provided on our Website. We may also send promotional push notifications or alerts to your mobile device, with your consent. You can deactivate these messages at any time by changing the notification settings on your mobile device. |
| **To contact you about our services including marketing** | We may contact you by email, live chat, telephone, text message, mail or social media for communications related to your use of our services and products, including in connection with your accounts, offers and information about our products and services, promotions and competitions you choose to enter, online surveys, new features that you are entitled to access, and other important information. Please see section 8, **Your Privacy Rights**, for your opt-out rights. |
| **To send important notices to you** | From time to time, we may send important notices to you, such as communications about purchases you have made, or legal notices regarding the changes to our terms and conditions or other policies. This information is important to your interactions with us and you acknowledge that you may not opt-out of receiving these communications. |

817c/media/Project/VGW/LuckyLandCasino/documents/251230_POL_LLC_Privacy_Policy_1-2.pdf (last visited Jan. 27, 2026) (same).

Georgia residents directly to "personalize user experience" and send "promotions and competitions" directly to your phone, email, or social media.[3]

27. Defendants knowingly accept payments from Georgia bank accounts and debit/credit cards for the purchase of virtual coins, which users, including Plaintiff, then use to place wagers on the websites.[4]




[3] *Id.*

[4] https://help.chumbacasino.com/article/CHU-How-to-purchase-Gold-Coins-using-Online-Banking (last visited Jan. 27, 2026).

28. Defendants likewise distribute virtual coins in Georgia and pay out prizes, including cash deposits into Georgia bank accounts, debit cards, and gift cards.

29. Defendants derive substantial revenue from their continuous and systematic contacts with Georgia.

30. Defendants also obtain user information from third parties, like Google and Facebook to track users' "use of or interests in [Defendants'] services."[5]

31. Defendants use this information in part to block users from states where their services have already been outlawed, demonstrating their ability to geographically restrict access when desired.

32. Additionally, personal jurisdiction is proper because Plaintiff resides in Georgia, has submitted to the jurisdiction of this Court, and because Defendants accepted service and moved to compel arbitration in similar litigation—further evidencing consent to jurisdiction.

33. Throughout the relevant time period, Defendants systematically conducted and continue to conduct business in Georgia.

34. It was foreseeable, and intended, that Georgia residents would use Defendants' websites, as Defendants were well aware that Georgia customers regularly participated in online gambling through their websites.

35. Defendants expressly ask users during registration to identify their state of residence, and notably did not list Georgia as an excluded territory.

36. Defendants also took affirmative steps to make the websites accessible to Georgia residents, despite the availability of widely used technology that can detect a user's location and

[5]https://media.www.chumbacasino.com/vgwholdings89e8-vgw-prod-817c/media/Project/VGW/ChumbaCasino/documents/251230_POL_CHU_Privacy_Policy_7-3.pdf (last visited Jan. 27, 2026).

block access where online gambling is illegal. Reputable online gambling companies employ such technology routinely.

37. Defendants, however, chose not to implement it, prioritizing revenue over compliance and knowingly enabling Georgia residents to engage in online gambling.

38. Defendants profit substantially from Georgia users, who make up a significant portion of their customer base.

39. Defendants reached into Georgia, advertised in Georgia, and invited Georgia residents to participate on their websites. By doing so, Defendants purposefully availed themselves of the privilege of conducting business in Georgia.

40. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000 and Plaintiffs and at least one Class member are citizens of a different state than Defendants.

41. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are deemed to reside in any district where they are subject to personal jurisdiction. Plaintiff wagered and lost money in this District, and Defendants marketed, advertised, and accepted wagers here. Thus, a substantial portion of the events giving rise to the claims occurred within this District.

## IV. FACTUAL ALLEGATIONS

### A. The Problem Of Online Gambling

42. The online gambling industry is profiting from gambling addiction the same way the Sackler family once profited from opioids.

43. For decades, the proportion of Americans diagnosed with pathological gambling held steady at less than 1 percent, with 7 million Americans believed to be suffering from a gambling addiction at an annual “social cost” of $14 billion. But those numbers have skyrocketed

with the advent of online gambling: from 2021 to 2022, there was a 45 percent increase in the number of calls, texts, and messages to the National Problem Gambling Helpline.

44. According to one study, up to 30 percent of problem gamblers have attempted suicide, while a larger percentage of such individuals reported having suicidal ideations.

45. The fallout is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers.

46. During the last five years, online gambling websites have proliferated with no way to reduce the ensuing harm. This shift is already evident with the gamblers who seek treatment, who tend to be younger, predominantly male, and raised on smart phones.

47. Treating online gambling addiction poses challenges that are different from other forms of addiction. For an individual with substance use disorder, safety measures like disposing of all alcohol or drug paraphernalia or avoiding triggering social events are key to treatment.

48. Things are not so clear-cut when treating digital gambling because for most people, mobile devices have become a necessity of life. So, it's not a question of avoiding the drive to the casino, but instead, a constant struggle to avoid the temptation to gamble from home, work, restaurants, the grocery store, while on vacation, and anywhere else where the gambler's device can receive a signal. Furthermore, unlike the billions of dollars of federal funding dedicated to alcohol, tobacco and drug addiction programs, there are no federal funds allocated to support problem gambling services.

49. To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like ChumbaCasino.com and Luckylandslots.com are unlicensed and unregulated.

50. A gaming license is a privilege that requires, among other things: (1) meeting state standards; (2) background checks on company officers and directors; (3) adherence to responsible gaming programs; (4) anti-money laundering measures; and (5) myriad other requirements concerning data privacy, security, and responding to customer complaints. Defendants dodge all of these requirements.

51. As one gambling treatment provider warned, "[u]nregulated platforms like Chumba Casino can pose significant risks for players struggling with gambling addiction. The lack of proper safeguards often exacerbates financial and emotional stress, making it harder for individuals to regain control."

52. For example, Defendants accept credit cards to pay for gambling on their websites, in violation of the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367.

53. Internet forums are awash with tales of people who've racked up massive debt gambling on ChumbaCasino.com and Luckylandslots.com, as the examples below illustrate:

> *I'm going to have to close my account. I'm so disgusted with myself and don't know if I should blame Chumba or myself. Or quite frankly even the social influencers who turned me to Chumba. At the end of the day I know it's really my fault, I just wonder if Chumba is operating fairly to everyone. Ugghhh. Going to have to pull from savings to pay credit and have know idea how I'm going to explain this to my wife. What has got into me?!!*
>
> ***
>
> *I won 6k my first time playing. Then another 3k. Won 10k in one week on luckyland. Saved some and then put it back in chumba. In the end I am in knee deep shit of debt. I fucked myself thinking I could keep winning. Close your account.*
>
> ***
>
> *I got drunk and lost $27,000 between pulsz and Chumba the last two days. Probably will have to cancel my wedding.*
>
> ***
>
> *… I feel like I'm so far gone I don't know what to do. I'm in such a bad spot right now. I gambled my rent money away. Our car just got totaled. I work a 1099 wfh job that allows you to schedule your own time working. I haven't been able to*

> *pick up any hours. I just recently about 5,000 a couple weeks ago and gambled about 4,000 away. I tell my fiance to hold my money for me so I won't spend it and then I go on his phone and transfer the money to myself. When I want to gamble I start shaking. It's getting really bad. My finance is pretty much done with me and wants to take the kids away from me from ruining my families lives. He has given me so many chances and I just keep fucking them up. I struggle with mental health issues already I'm debating just checking myself into a mental institution for a little bit. My fiancé has contacted my family members to make them aware of my gambling addiction and how serious it's become. I hid it from everybody besides my fiancé. I'm pretty sure I'm not gonna have nobody left after this.*

54. Defendants also deprive state and local governments of tax revenues that legitimate, regulated casinos pay.

55. The bottom line is that Defendants let people play online casino games and wager real money while skirting regulation and licensing, offering inadequate player protections, and siphoning revenue from state *governments*.

56. Against this backdrop, it is a breathtaking display of chutzpah and lawlessness for Defendants to operate in Georgia, where gambling is strictly regulated to minimize the social costs of gambling.

**B. Defendants Operate Gambling Websites**

57. The very name of the websites "Chumba Casino" and "Luckyland Slots" is a clear reference to the purpose of the websites: gambling.

58. As soon as users log onto the websites, the first thing they see is an array of colorful, digital slot machines, along with information about the user's gambling balance near the top of the screen, denoted with the letters "GC" and "SC," which as explained more fully below, are the digital gambling chips used to gamble on the websites:[6]

---

[6] The images shown in this Complaint are from ChumbaCasino.com. The LuckylandSlots.com website is the same in all material respects, with the differences primarily being branding, color themes, and the names of individual slot machines.




59. Just like one would see on the floor of a brick-and-mortar casino in Las Vegas, the digital slot machines come in a wide variety of styles and themes, such as the examples shown below:






60. All of the slot machines operate in essentially the same manner. The primary difference between one slot machine and the next has to do with the imagery and theme of the game; other than that, each slot machine is the same in all material respects inasmuch as they all involve gambling.

61. Another part of the website is dedicated to "Table Games," like poker, blackjack, and other games typically seen on a casino floor. ChumbaCasino.com offers "live dealer" table games where online players interact directly with dealers visible via a webcam to play games like blackjack, roulette, and poker:




Type here to chat
CHUMBA CASINO
Blackjack
Insurance
Awards 2 to 1
Blackjack awards 3 to 2
Coins
GC 0
Server Time:


Chumba Casino Hold'em GC 100,000-200,000,000
WAIT FOR THE NEXT ROUND
Sanita
MORE GAMES
Type here to chat
CHUMBA CASINO
Host qualifies with Pair of 4s or Better
DEALER
PLAYER
HIGH CARD
SWITCH TO COMBINED HANDS
ANTE
Coin amount
GC 1,649,000.00
Coins
GC 0
Server Time:
11/11/2025 16:28:34 (GMT)

62. This is not just "simulated" gambling. As detailed in the sections below, Defendants target the "real-money gaming market" "despite significant prohibition," and website users can gamble $10,000 or more per day.

### C. Defendants Have Scaled Up An Illegal Tactic That Criminals Once Used To Evade State Gambling Laws

#### 1. <u>The Internet Café Gambling Scam</u>

63. In the early 2000's saw a trend among criminal organizations offering gambling at Internet cafés. These operations—often located in suburban strip malls—would "promote" the sale of a product such as Internet time or long-distance telephone minutes by offering "free" sweepstakes entries to customers. When customers purchased Internet time or whatever other product was offered, they received a corresponding number of sweepstakes points for each dollar spent. Customers could then use those sweepstakes points to play "casino-style" slot machine games for cash prizes at computer terminals provided at the Internet cafés.

64. Many states' gambling and/or sweepstakes laws require three elements: prize, chance, and consideration (i.e., payment). By artificially separating the consideration from the chance to win real money, operators of Internet cafés believed that they could evade state gambling laws, while claiming that the activities were no different from the kinds of sweepstakes promotions occasionally offered by Publisher's Clearing House and McDonalds.

65. Internet cafés were a significant problem in Georgia. In August 2011, for example, state officials in Georgia announced a unified effort to prosecute as many as 100 Internet cafés around the state. When the Internet café owners claimed they were operating within a loophole in state gambling laws, state law enforcement agencies responded that the existing code was "black and white on that issue," and that the Internet café owners were clearly violating state gambling laws. Nonetheless, the following year, the legislature enacted O.C.G.A § 16-12-20(4) to remove

any more bogus arguments about loopholes. That statute makes it illegal to offer any game of chance played on a computer, or any "no skill game" played for "cash, other consideration, other evidence of winnings, or other noncash prizes by lot or in a finite pool on a computer, mechanical device, or electronic device."

### 2. Defendants Have Admitted That Their Websites Are Based On The Internet Café Model

66. Although Defendants will deny in this litigation that their websites involve gambling, that is not what they said before when seeking investors. On January 4, 2016, prospectus, a related company VGW Gaming Limited admitted that the business model in ChumbaCasino.com and Luckylandslots.com **is modelled on the illegal Internet cafés that were popular in the early 2000's**:

> 67 Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.
>
> 68 Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

Exhibit 6, at p. 95.[7] The prospectus also explains how, at the time, "**Internet Sweepstakes Cafes** are reported to have turned over **$10bn (€9.4bn)** in 2015, with **over 5,000** now operating in **12 states**" (*id.* at 69 (emphasis added)), and described the "significant opportunity" of adopting the "sweepstakes café model." *Id.* at 95-96.

67. The prospectus was prepared by H2 Gambling Capital, which is described as "the leading authority regarding market intelligence on the global gambling industry." *Id.* at 68. The

[7] The complaint includes only excerpts of the Prospectus due to its voluminous size.

prospectus refers to "gambling" 79 times, and noted that "**despite significant prohibition**, [the U.S.] remains by far the largest gaming market in the world." *Id.* at 69 (emphasis added).

68. Likewise, in an October 2015 press release in Australia, Defendant VGW Holdings Limited stated that its gambling websites are "targeting the global casino market, particularly the unrealised [sic] United States **real-money gaming market**."

- VGW is an Australian technology and online gaming company that develops and operates international cash-prize contests through its innovative social casino products. It currently operates on the largest social network and leverages the world's leading payment provider platforms.
- VGW operates a sweepstakes social casino, targeting the global casino market, particularly the unrealised United States real-money gaming market.

Exhibit 7, at p. 1.

69. When denying that the websites offer gambling, Defendants have consistently deployed the same arguments that operators of Internet cafés unsuccessfully deployed in cases in Georgia and across the United States.

70. Like the criminal Internet cafés in operation a decade ago, Defendants here attempt to separate the element of consideration from gambling by offering a two-tiered system of virtual coins, both of which function like casino chips.

71. The first type of virtual currency –called "Gold Coins" – can be used to play the casino games in "standard mode" with no potential for redeeming any prizes. When gambling in "standard mode" with Gold Coins, a player can only win or lose Gold Coins, which can be used to place wagers on the various games. The second type of virtual currency –called "Sweeps Coins" – can be used to play the same casino-style games in a "promotional sweepstakes mode," where they carry real monetary value and can be redeemed for prizes and money.

72. When a player first starts up an account on the website, they are given a free initial allotment of virtual Gold Coins, and a small number of virtual Sweeps Coins. These coins are

required for gameplay. The chance for a player to win more coins or lose their bet is a fixed random chance and not skill-based. All games require a "minimum bet" of coins before a player can play. If a player runs out of coins or has less than the amount required for a minimum bet, they cannot play the game until they replenish their supply.

73. Players can buy different packages of virtual Gold Coins for real currency, ranging from $1 for 200,000 Gold Coins to $200 for 120,000,000 Gold Coins.

74. When a person purchases Gold Coins, they also receive Sweeps Coins, which is by far, the most common way for users to obtain Sweeps Coins. The more Gold Coins a user purchases, the more Sweeps Coins the user also receives. So, in effect, when a person buys Gold Coins, they are also buying Sweeps Coins as part of a package.

75. Moreover, the number of Sweeps Coins is essentially a proxy for the amount of real money spent or won. That is because the standard coin bundles involve a nearly 1:1 correlation between the number of dollars spent and the number of Sweeps Coins provided in each purchase. So, for example, if someone spends $100 dollars ostensibly to by Gold Coins on Chumba Casino, they get 104 Sweeps Coins.

76. Likewise, Sweeps Coins are redeemable on a 1:1 basis. So, for example, 100 Sweeps Coins can be redeemed for $100.

77. Defendants claim that no purchase is necessary to buy Sweeps Coins and that they are just a "bonus" added to the purchase of Gold Coins, but the reality is that generally, both coins must be purchased, and Respondent will only sell them together as a package. As noted above, claiming that sweepstakes tokens are just a free bonus is an old tactic that criminal operators of Internet cafés unsuccessfully used to evade gambling laws.

78. Players can use real currency to purchase additional virtual Gold Coins and Sweeps Coins through the website. In this way, the purchase of virtual coins is like what happens when a player purchases casino chips in a brick-and-mortar casino, which can then be used to place wagers at table games.

79. There are several other factors that show that the true purpose of Defendants' websites is gambling, and that like the Internet cafés that preceded the launch of Defendants' website, the use of the term "sweepstakes" is a pretext for gambling.

80. First, the casino-like atmosphere and imagery associated with the website, as well as the use of the word "casino" in the website name, is evidence that the true purpose of the website is to promote gambling, as opposed to a sweepstakes promotion of some other good or service.

81. Second, the duration of the "sweepstakes" promotion also demonstrates that the true purpose of the websites is not to promote a bona fide consumer good or service but instead gambling. A traditional sweepstakes promotion is a limited term event designed to attract consumer attention to a product or business and ordinarily expires after a few weeks or months. In contrast, Defendants' purported "sweepstakes," run perpetually.

82. Third, the typical payout percentage for a temporary promotional sweepstakes is a small percentage of revenue earned by the company. For example, the typical grand prize for McDonald's annual Monopoly-themed sweepstakes is usually about $1 million, which is a tiny fraction of the *billions* of dollars McDonald's earns each year. By contrast, casinos typically pay out between 80-96 percent of their revenues (sometimes referred to as the "return to player" or "RTP"). Defendants claim to have a 90-96% RTP on its websites.

83. Fourth, conditions designed to keep customers playing longer are indicative that the true purpose of the websites is to keep them gambling, rather than a true sweepstakes aimed at

promoting a product or service. Unlike traditional sweepstakes games where prizes can be claimed immediately, Defendants impose restrictions on prize redemption that can cause website visitors to play longer. Specifically, website visitors must have at least 100 Sweeps Coins to redeem. This forces consumers to continue gambling and eventually lose their balance.

84. Fifth, most if not all users of the websites largely ignore their ample supply of Gold Coins in favor of playing Sweeps Coins, which is a clear indication that the Sweeps Coins, and not the supposedly promoted product (Gold Coins), are the primary subject of the transaction.

85. In sum, the parallels between Defendants' websites and the Internet sweepstakes café business model—which courts have held are incontestably gambling—are clear:

- ✓ Both sell a "product" that comes with a commensurate number of "free" sweepstakes entries to play real money 'casino-style' games of chance in a 'casino-like' setting. Instead of the cafés selling a "prepaid phone card," Defendants sell virtual Gold Coins.
- ✓ Both run sweepstakes games perpetually and not on a limited and occasional basis, as is typical with legitimate promotional sweepstakes like the McDonald's monopoly sweepstakes.
- ✓ Both offer casino-like payouts, typically 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to entrant ratios.
- ✓ Both offer several ways to get free entries without requiring a product purchase, such as by mailing a postcard to a designated P.O. Box address, although the number of free entries awarded through this method is a very low amount, if anything at all.

### 3. Defendants Mislead The Public With False Claims Of Legality

86. Defendants mislead consumers into believing that participation on the websites is legal and permitted in Georgia.

87. On the LuckyLand Slots website, Defendants tell website users:

> Our games are fully accessible to players across the United States, with the exception of Connecticut, Delaware, Michigan, Montana, Nevada and Washington. We operate under the highest integrity and compliance with all applicable laws and regulations, ensuring we provide you with a safe, secure and enjoyable social casino experience every time you log in.

88. Similarly, on the Chumba Casino website, Defendants tell website users:

> ONLY PLAYERS IN THE UNITED STATES (EXCLUDING THE STATES OF CALIFORNIA, CONNECTICUT, DELAWARE, IDAHO, LOUISIANA, MICHIGAN, MISSISSIPPI, MONTANA, NEVADA, NEW JERSEY, NEW YORK, TENNESSEE, WASHINGTON AND WEST VIRGINIA) ARE ELIGIBLE TO ENTER THE SWEEPSTAKES. PLEASE REFER TO CLAUSE 1.1 OF THE SWEEPS RULES TO CHECK YOUR ELIGIBILITY

89. Defendants do not include Georgia as an excluded territory, even though online casino gambling is not authorized by Georgia law and is unlawful unless specifically authorized by the Legislature.

90. Further, Defendants state that if the user is in an excluded territory, the user will not be able to access or even use the platform, create an account, play the games, or interact with the websites in any other way. Yet Defendants allow Georgia residents to access, register, and play the games of chance on the websites in this state.

91. By affirmatively excluding some states while omitting Georgia, Defendants create the false impression that Georgia is a jurisdiction in which its gambling websites are lawful and permitted. This omission misleads reasonable consumers into believing the websites are legal, approved, or regulated by the State of Georgia.

92. Defendants further reinforce this false impression of legality by requiring players to verify their identity and residence and to verify or link a bank account before redeeming Sweeps Coin winnings for cash prizes. These compliance-style verification requirements mirror the

processes used by regulated real-money gambling and financial platforms and signal to consumers (falsely) that Defendants' casino operations are lawful and properly authorized.

93. Defendants also falsely represent that their websites are legal in the Help Center portions of the website. In the Luckyland Slots Help Center, for example, Defendants post the following question and answer: "Is LuckyLand Slots legal?" "Yes, LuckyLand Slots is a social casino site that offers its players a thrilling social gameplay experience. Casino-style social games are available to players residing in the United States (excluding outlying Territories and the States of Connecticut, Delaware, Michigan, Montana, Nevada, and Washington)." Chumba Casino has a near identical post on the Help Center potions of the website.[8]

94. Defendants also fail to disclose to website users that the websites are modelled off of internet cafés, and indisputably illegal practice associated with organized crime.

95. Defendants' deception is material. Georgia residents, including Plaintiffs, would not have gambled on Defendants' websites had they known the truth—that the online casino operations are illegal in this state.

## V. CLASS ACTION ALLEGATIONS

96. Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

97. Plaintiff seeks to represent the following Georgia Class ("Class") defined as:

> All persons in Georgia who purchased coins on www.Luckylandslots.com or www.ChumbaCasino.com.

98. Excluded from the Class are Defendants and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.

---

8 *See* https://help.luckylandslots.com/article/LLS-Is-LuckyLand-Slots-legal (last visited Jan. 27, 2026); https://help.chumbacasino.com/article/Is-Chumba-Casino-legal (last visited Jan. 27, 2026).

99. Plaintiff reserves the right to amend the Class definition or add subclasses, as appropriate, during the course of this litigation.

100. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

101. **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believes that there are hundreds to thousands of members of the Class, the precise number of Class members is unknown to Plaintiff but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

102. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants' alleged conduct violates applicable law;

c. Whether Defendants' websites are illegal gambling in Georgia;

d. Whether Plaintiff and Class members wagered and lost money or other things value on the Casino Websites in Georgia;

e. Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief;

f. Whether the Court should issue an injunction shutting down operation of the websites; and

g. The amount and nature of relief to be awarded to Plaintiff and the other Class members.

103. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the Class members wagered and lost money or other things of value on the websites in Georgia. Also, neither Plaintiff nor the other Class members would have participated on the websites if Defendants had not engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

104. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class that she seeks to represent, Plaintiff retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and counsel.

105. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

106. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no

unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Class members to individually seek redress. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

107. **Ascertainability** – Defendants maintain a database with all its participants, and verifies each participant's state of residence. Each participant must create an account to participate and must select and verify which state they are from. Defendants also assign each participant's account an individually identifiable number, and Defendants track winning and losses, because they control how much a player can wager and cashout a day.

**FIRST CAUSE OF ACTION**
**O.C.G.A. § 13-8-3**

108. Plaintiff repeats and re-allege all previous paragraphs, as if fully included herein.

109. Plaintiff brings this claim on behalf of herself and class members.

110. Section 13-8-3 permits recovery of all "[m]oney paid or property delivered upon a gambling consideration. All money spent purchasing coins on the subject websites was "money paid" upon gambling consideration.

111. Plaintiff purchased coins on both of the subject websites, and lost money gambling on those websites.

112. Plaintiff seeks all relief available under this statute.

## SECOND CAUSE OF ACTION
**O.C.G.A. § 10-1-372(a)**

113. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

114. Plaintiff brings this claim on behalf of herself and all class members.

115. The Georgia Uniform Deceptive Trade Practices Act is codified Official Code of Georgia Annotated § 10-1-370, et seq. 219. Georgia's Uniform Deceptive Trade Practices Act defines a deceptive trade practice to include, among other things, the following:

a. Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services. Ga. Code Ann. § 10-1-372(2).

b. Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have. *Id.* at § 10-1-372(5).

c. Advertises goods or services with intent not to sell them as advertised. *Id.* at § 10-1-372(9).

d. Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. *Id.* at § 10-1-372(12).

e. Conducting "unlawful lotteries." Ga. Code Ann. § 10-1-393(b)(16)(N).

116. Defendants' conduct, as set forth herein, constitutes unfair or deceptive acts or practices under the Uniform Deceptive Trade Practices Act.

117. Defendants violate § 10-1-393(2), (5), (9), and (12) by misleading consumers into believing that the subject websites are lawful and regulated, and do not constitute illegal gambling.

118. Defendants violate § 10-1-393(b)(16) because in connection with the subject websites Defendants:

a. Do not provide the notice required under § 10-1-393(b)(16)(D);

b. Require participants to purchase goods or services to participate, in violation of § 10-1-393(b)(16)(G);

c. Do not clearly disclose limitations on eligibility of participants, within the requirements of § 10-1-393(b)(16)(H);

d. Do not clearly disclose a list of all winning participants, within the requirements of § 10-1-393(b)(16)(M);

e. Offers cash prizes or prizes that are redeemable for cash, in violation of § 10-1-393(b)(16)(N.1);

119. Plaintiff and class members were injured as a result of Defendants' unlawful conduct.

120. Plaintiff seeks all relief available under this cause of action, including but not limited to an injunction shutting down operation of the subject websites in Georgia, and a return to Plaintiff and class members of all money paid to use the websites.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment/Restitution**

121. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

122. Plaintiff brings this claim on behalf of herself.

123. To the extent required by law, this cause of action is alleged in the alternative to legal claims.

124. Plaintiff conferred a benefit on Defendants in the form of the gross revenues Defendants derived from their role in the operation of the websites.

125. Defendants have been unjustly enriched in retaining the unlawful gambling revenues derived from Plaintiff. Retention of such revenues under these circumstances is unjust and inequitable because (1) Defendants falsely imply to website users that its websites do not involve illegal gambling; (2) Defendants profit from and exploit individuals who struggle with gambling addiction; and (3) Defendants' business model depends on exploiting perceived loopholes in state gambling law.

126. Defendants benefit financially from the unlawful websites and retain financial benefits from consumers who loose money on those websites. Defendants are not "innocent third parties," but instead are key players in the operation and promotion of the websites.

127. There is a direct relationship between the detriment experienced by Plaintiff and the benefits that Defendants obtain as a result their roles in operating the websites. The detriment to Plaintiff and Defendants' benefits all flow from the challenged conduct at issue here: namely, the operation of unlawful gambling websites.

128. Defendants' conduct in operating and marketing the websites was a proximate cause of Plaintiff's injuries.

129. Plaintiff lacks an adequate remedy at law with respect to this claim and is entitled to non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of their unjust conduct.

## <u>FOURTH CAUSE OF ACTION</u>

### Fraudulent Concealment

130. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

131. Plaintiff brings this claim on behalf of herself.

132. Defendants failed to disclose and made deceptive partial statements that had the tendency or capacity to deceive or confuse Plaintiff and class members into believing that the subject websites are lawful in Georgia.

133. The omissions and misleading partial representations were material because they pertained the legality of the subject websites.

134. Defendants intended to mislead Plaintiff and class members.

135. Plaintiff and class members were not aware that the subject websites were illegal when they used the websites.

136. Plaintiff and class members reasonably relied on the uniform deception that the websites were purportedly legal.

## FIFTH CAUSE OF ACTION

### Declaratory Relief

137. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

138. Plaintiff brings this claim on behalf of herself.

139. Plaintiff seeks a declaration and determination that the Terms and Conditions, including all provisions within them, were never validly formed or are otherwise unenforceable due to illegality, lack of consideration, illusoriness, unconscionability, and/or other defects in formation or enforceability.

140. Plaintiff seeks a declaration and determination that her dispute is not arbitrable and may appropriately be filed in state or federal court.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representatives, and appointing Plaintiff's attorneys as Class Counsel;

B. Declaring that ChumbaCasino.com and Luckylandslots.com are illegal gambling in Georgia and that any authority under which they purports to operate is not Constitutional;

C. Enter a permanent injunction permanently enjoining Defendants from operating ChumbaCasino.com and Luckylandslots.com in Georgia;

D. Ordering Defendants to refund all wages lost by the Class and pay actual and statutory damages (including punitive damages) and restitution and disgorgement of profits to Plaintiff and the Class, as allowable by law;

E. Ordering Defendants to pay both pre- and post-judgment interest on any amount awarded;

F. Ordering Defendants to pay attorneys' fees and costs of suit; and

G. Ordering such other and further relief as the Court may deem just, equitable, and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 29, 2026

*By: /s/ H. Clay Barnett, III*
H. Clay Barnett, III (GA Bar No. 174058)
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Overlook II

2839 Paces Ferry Road, Suite 400
Atlanta, GA 30339
(334) 269-2343 / F: (334) 954-7555
Clay.Barnett@BeasleyAllen.com

W. Daniel “Dee” Miles, III
James Mitchell “Mitch” Williams
Dylan Martin
Trent Mann
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36103-4160
T (334) 269-2343 / F (334) 954-7555 FAX
dee.miles@beasleyallen.com
mitch.williams@beasleyallen.com
dylan.martin@beasleyallen.com
trent.mann@beasleyallen.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (BBO 712418)
867 Boylston Street 5th Floor #1520
Boston, MA 02116
T: 617-377-4704 / F: (888) 410-0415
E-Mail: joel@skclassactions.com

*Attorneys for Plaintiff*